Filed 4/26/16  P. v. Galvan II CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DANIEL JOSEPH GALVAN II,<br><br>Defendant and Appellant. | F068752<br><br>(Super. Ct. No. F12904509)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Denise Lee Whitehead, Judge.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted appellant Daniel Joseph Galvan II of first degree murder (Pen. Code, § 187, subd. (a); count 1)[1] for the death of his wife, finding true that he personally used a firearm in the commission of the crime (§ 12022.53, subd. (d)). He was also convicted of two counts of misdemeanor child endangerment (§ 273a, subd. (b); counts 3 & 4). Prior to trial, he entered a plea of no contest to possession of a firearm as a convicted felon (§ 29800, subd. (a)(1); count 2). He was sentenced to three years in state prison for count 2, followed by two consecutive terms of 25 years to life for count 1. He received credit for time served for counts 3 and 4. Total time credits of 583 days were awarded. Regarding counts 3 and 4, the minute order for the sentencing hearing states appellant is "to serve 583 Days Fresno County Jail."

On appeal, appellant contends his conviction for murder must be reversed based on several alleged instructional errors, alleged prosecutorial misconduct, the trial court's alleged failure to respond properly to a jury note, and the cumulative prejudice from those alleged errors. He further asserts his convictions for child endangerment must be reversed for insufficient evidence and for additional alleged instructional error. We find these arguments unpersuasive. However, we agree with the parties that the sentences on counts 3 and 4 exceed the permissible jail term. We direct the trial court to reduce those sentences but otherwise affirm the judgment.

## BACKGROUND

### I.      Trial Facts.

#### A.      Prosecution's case.

##### 1.      The events before the homicide.

Prior to the murder, appellant had been estranged from his wife, Ann Marie Galvan, who had been residing away from him in Arizona. Approximately two weeks

---

[1]      All future statutory references are to the Penal Code unless otherwise noted.

before the murder, Galvan returned to Fresno with their two minor sons, both under 10 years of age, and they resumed living with appellant.  During those two weeks they lived in the same house appellant shared with Priscilla Dominguez (his sister), Priscilla Jaramillo (his niece), Jaramillo's boyfriend and their baby, along with appellant's bedridden mother.[2]  Appellant and Galvan occupied a bedroom across the hall from his mother's master bedroom.

Appellant appeared happy and normal during his first week with Galvan.  However, during the second week he often remained in his bedroom with her, and they could be heard arguing a few times, but it never escalated to screaming.  During this second week, appellant used methamphetamine, a drug which he had abused in the past.  Both Dominguez and Jaramillo had previously seen appellant under its influence.  Dominguez described his behavior during that second week as "different," "up," "deranged," and "kind of tripped out, you know."  She also saw some empty 40-ounce beer bottles in his bedroom around this time.  Jaramillo believed appellant was using methamphetamine during the three days leading up to the murder.  He was not eating, he kept to himself in his room, he appeared paranoid, and his mood worsened, becoming more negative and angry.  Approximately two or three days before the murder, appellant told Jaramillo that he thought Galvan was "cheating" on him "or talking to other people."

### 2. The homicide.

On June 18, 2012, the day of the murder, appellant and Galvan spent most of their time in their bedroom.  When they came out, Dominguez noticed that appellant acted "odd" and followed Galvan around or stayed very close with her.  He appeared to be under the influence of drugs.  That evening, Jaramillo became uncomfortable and told her boyfriend that appellant was acting weird and he looked delirious.  Jaramillo wanted to spend the night somewhere else.

---

[2]     Appellant's mother passed away before his trial.

Jaramillo took a shower around 10:00 p.m. While in the bathroom she noticed a closed gun case behind the toilet. Galvan had previously told Jaramillo that she had a gun in the house. After her shower, Jaramillo saw appellant in the living room sitting in a chair. He was wearing shorts and Jaramillo could see a gun in his pocket, which he removed and held between his legs. Galvan was standing nearby and their boys were eating at a nearby dining table. Galvan asked appellant what he was doing, and she told him to put the gun away. Appellant kept the gun in his hand, and stared or looked at Galvan. Jaramillo ran to her grandmother's bedroom and told her grandmother that appellant had a gun. Galvan followed, entered the same master bedroom, and asked appellant's mother to tell appellant to stop. Jaramillo walked back out into the hallway, encountering appellant in or near the hallway restroom. Appellant asked her to take the boys and get them something to eat. Jaramillo declined because they were already eating. Appellant asked her to bring Galvan out from his mother's bedroom and take her to the hallway restroom, which she declined to do. Appellant said something like he did not want to get Jaramillo involved or he would not get her in the middle, and he asked her to tell Galvan to come to the restroom. Jaramillo again refused and she left the house, seeing her mother (Dominguez) outside. Dominguez told the jury that Jaramillo "flew" out of the house looking scared.

While outside, both Dominguez and Jaramillo heard multiple gunshots. Jaramillo ran across the street where she waited until police arrived. Dominguez had a view into the house through a front screen door and she saw appellant's sons running down the hallway. They appeared shaken and scared. Appellant came out and spoke with his sons, who were asking where their mother was and whether she was okay. Appellant told his sons not to worry and that everything was going to be okay. Dominguez backed away from the house. At some point, Dominguez called 911 on a house telephone which she had with her outside. The 911 call was played for the jury.

4.

From inside the house, appellant's mother participated in the 911 call. Dominguez informed the dispatcher that gunshots occurred in her mother's house. Appellant's mother said her son shot her daughter, who was on the floor. Dominguez told the dispatcher that appellant was still armed, and was on methamphetamine and alcohol.

Fresno police officers arrived on scene in approximately three minutes. Dominguez informed an officer that she believed appellant shot his wife. Officers took up a defensive position in front of the house where they could see inside through the front screen door. The interior of the house was well lit. Appellant was observed pacing back and forth in the living room and then later sitting in a chair watching the officers. He did not have a gun in his hands. An officer in full uniform made eye contact with appellant, and that officer believed appellant could see their marked patrol car. Appellant left his chair and disappeared from view.

Other units and a tactical team arrived on scene. Jaramillo's boyfriend exited the house without incident carrying the baby. Appellant was again observed pacing in the living room but this time with his two sons. After he paced for a while, appellant appeared at the front door with his two sons in front of him as if he were using them as a shield. He was ordered to show his hands, and appellant said, "Who me? I didn't do anything." Appellant said he needed to get a soda, and he ran back inside the house. An officer ran to the doorway and retrieved the children without incident. Appellant returned to the door and complied with the officers' commands to show his hands and come outside. He was arrested without further incident.

Officers searched the residence and found appellant's mother lying in her bed in the master bedroom. She was described as hysterical. She said, "He shot her. He shot her. I can't believe he shot her. He killed her right in … front of me." Galvan's body was discovered in the master bedroom lying in a small space between the wall and the bed. She had sustained multiple gunshot wounds.

5.

### 3. The homicide investigation.

A homicide detective arrived on scene at approximately 11:30 p.m. and interviewed appellant a short time later in the back of a patrol vehicle. Appellant was told he would be tested for gunshot residue powder, his blood would be drawn at a hospital, and he would be transported to the police station. Upon being told that police were waiting for a search warrant to reenter the residence, appellant told the detective that the gun was "inside the bedroom before you get to the master bedroom. I think it's a .45 or something like that." Police later located a gun inside appellant's bedroom closet. The gun was not a .45-caliber and no fingerprints were discovered on it.

The detective spoke with appellant for approximately seven minutes in the back of the patrol vehicle. Appellant appeared to understand everything that was asked and he did not provide nonsensical answers. Samples of appellant's blood were drawn at approximately 12:30 a.m., which tested positive for methamphetamine at 190 nanograms per milliliter. A potentially toxic level of methamphetamine occurs at 200 nanograms per milliliter.

Police located a gun case in the hallway bathroom behind the toilet. In the master bedroom, six expended shell casings where discovered, along with a deformed bullet fragment and a deformed casing. Following an autopsy, Galvan's death was ruled a homicide caused by approximately eight gunshot wounds she received to her face, torso, right arm and shoulder, and left wrist/hand. Based on indicators on Galvan's skin, the medical examiner determined that a shot in her right shoulder just above her breast was fired with the gun in contact with her skin. Two other shots, both to her right arm, were fired between a foot and two feet away. Appellant fired the other shots at a distance greater than two feet from Galvan. During the autopsy, a sample of Galvan's blood was drawn, which tested positive for methamphetamine. Galvan's blood concentration of methamphetamine was more than two times what is generally accepted as a toxic level.

## 4.    Appellant's police interview.

Homicide detectives formally interviewed appellant at the police station starting around 3:00 a.m.  The interview lasted approximately two hours.  An audio/visual recording was made, which was played for the jury.

At times during the interview appellant said he was sleepy or tired, and he closed his eyes.  The detectives continued the interview, sometimes telling him to stay awake or wake up.  At trial, an interviewing detective opined that appellant was pretending to fall asleep, which the detective said was common when suspects were being questioned.

At the beginning of the interview, appellant indicated he had no idea why police appeared at his residence or why he was being questioned.  He said he had been married to Galvan for about 12 years and he had no idea where she was, saying he had not seen her.  Appellant denied that an argument or disturbance occurred at his house.  He denied drinking any alcohol that day but admitted he was "probably" under the influence of drugs.  He could not remember telling the detective in the patrol vehicle about the location of a gun in the house.  He denied knowing who fired shots.

Appellant was told that his sons said he shot Galvan.  Appellant expressed disbelief that they would say that, but admitted his sons were not liars.  He expressed disbelief that Galvan was dead, and he continued to deny shooting her, saying he did not remember shooting and his sons never saw him shoot.  He later said it could have been Jesus's fault and "Jesus Christ" did it.

The detectives suggested that he was having marital difficulties and appellant agreed that Galvan told him it was over.  He said he could not deal with that.  He later referenced Jesus again, expressing disbelief what Jesus said and did.  Appellant was asked what brought him to the breaking point.  He said at "the last minute" everything "flipped" and he "started flipping out."

Appellant said he could not remember where the gun was, but he agreed that he loaded it and Galvan was in his mother's room, along with his mother.  Galvan was

7.

standing and his mother was lying down. When asked what happened next, he said, "Uh, somehow, Jesus got in there."

Appellant said the gun was "a .380." He was not sure if he pointed the gun at his mother. He denied that Galvan made him "flip" and said it was something else. He said he could not remember pulling the trigger. Galvan was standing and she fell after the loud bang.

Appellant said his mother was crying. He said, "I was like, what the fuck? Oh, shit, man." He expressed disbelief about what happened and he left "to go pray." He did not let his sons go into that room and took them to another room, denying that he said anything to them. He said he first loaded the gun in his room. He denied knowing whose gun it was, then said it was his mother's gun that he found under the kitchen sink. He said Jesus put the gun there.

## B. Defense case.

Alex Yufik, a board certified forensic psychologist and a licensed California attorney, explained the history of methamphetamine and its effect in a person's system. He noted that a person will feel a tremendous sense of euphoria, which can last between 11 and 15 hours. Methamphetamine interferes with a person's ability to exercise critical thinking skills, and it reduces the ability to exercise emotional awareness. A high correlation of violence is connected with methamphetamine abuse. Psychosis can result, where the person loses touch with reality and does not process information accurately. A person using methamphetamine commonly shows paranoia and confusion. Brain damage can occur with prolonged use over time. Because methamphetamine is a stimulant, a person can be awake between two and four days without any sleep while under its effects, which further inhibits cognitive skills.

Yufik reviewed discovery from the case, including some of appellant's medical records, the police reports, and the police interview. He met with appellant for over seven hours, conducting a series of tests to determine appellant's intelligence level,

whether he was suffering true memory loss, and his personality measures. Appellant admitted he had struck Galvan with a closed fist on numerous occasions during their marriage. He began using substances around age 12, and first used methamphetamine at age 16, when he began a cycle of binging. Yufik opined that appellant's memory impairment was real and consistent with people who have abused methamphetamine. He determined appellant had a severe personality disorder, which is anti-social personality disorder, and methamphetamine abuse. Yufik opined that appellant's long-term methamphetamine use had a causal effect to the charged crimes. He believed appellant did not have the ability to plan, exercise judgment, or really understand the consequences of his actions when he shot Galvan. He thought the manner of the murder demonstrated impulsive conduct.

Yufik reviewed the recording of appellant's police interview and disagreed with the detective that appellant was faking when he appeared to be falling asleep. He believed appellant was sleepy and crashing from methamphetamine.

9.

## I. Any Instructional Error With CALCRIM Nos. 362 and 3428 Was Harmless.

Appellant contends instructional error occurred regarding CALCRIM Nos. 362 and 3428. He argues the jury was improperly instructed regarding consciousness of guilt in relation to his intoxication and/or mental disorder after the killing.

### A. Background.

The jury heard the following relevant instructions and closing arguments:

#### 1. CALCRIM No. 362:

"If the defendant made a false or misleading statement before the trial related to the charged crime knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. If you conclude the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

#### 2. CALCRIM No. 371:

"If the defendant tried to hide evidence, that conduct might show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance, however, evidence of such an attempt cannot prove guilt by itself."

#### 3. CALCRIM No. 3428:

"You have heard evidence that the defendant may have suffered from a mental disease. You may consider this evidence only for the limited purpose of deciding whether at the time of the charged crime the defendant acted with the intent or mental state required for that crime. The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically, willfully, deliberately and with premeditation and malice. If the People have not met this burden, you must find the defendant not guilty of first degree murder.

"The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically, malice aforethought. If the People have not met this burden, you must find the defendant not guilty of second degree murder."

### 4. CALCRIM No. 625:

"You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation, or the defendant was unconscious when he acted. A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink or other substance knowing that it could produce an intoxicating effect and willingly assuming the risk of that effect. You may not consider evidence of involuntary intoxication for purposes other than the defendant's mental state."

### 5. Closing arguments.

During closing arguments, the prosecutor noted that appellant claimed he could not remember what happened and then pretended to fall asleep during his interview with the detectives. The jury was told appellant tried to manipulate the detectives. The jury was reminded about the instruction that appellant's attempt to hide evidence may show he was aware of his guilt. The prosecutor argued that appellant hid the gun by placing it in a bag in his closet. The prosecutor also argued that appellant made false and misleading statements during his police interview, asserting that appellant was trying to determine what the detectives knew and had against him.

### B. Standard of review.

"In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled. [Citations.]" (*People v. Tate* (2010) 49 Cal.4th 635, 696.) In making this analysis, we presume jurors are intelligent people capable of understanding and applying all jury instructions given. (*People v. Gonzales* (2011) 51 Cal.4th 894, 940; *People v. Lewis* (2001) 26 Cal.4th 334, 390.)

For purposes of California law, the prejudicial effect of instructional error is determined under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Flood* (1998) 18 Cal.4th 470, 490.) Under that standard, reversal is

11.

not required if there is no reasonable probability the outcome of the trial would have been different had the trial court properly instructed the jury. (*Ibid.*)

For federal constitutional error, the beneficiary of the error must prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) This requires a finding that the error was unimportant in relation to everything else the jury considered on the issue. (*Yates v. Evatt* (1991) 500 U.S. 391, 403-404, disapproved on another point in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4.)

### C.    Analysis.

Appellant asserts that the jurors were only permitted to consider evidence of his voluntary intoxication and mental disorder at the time of the killing, which violated his right to due process. He contends the prosecutor argued a consciousness of guilt was present because of his statements to the detectives and because he hid the gun in his closet. He argues that his attempt to blame "Jesus Christ" for the shooting was consistent with a psychotic break induced by methamphetamine intoxication. He maintains the jury was required to ignore evidence of his intoxication and/or mental illness regarding his actions after the killing, concluding an "irrational permissive inference" occurred which permitted the jury to "irrationally infer" he was conscious of his own guilt. He contends his murder conviction must be reversed.

The parties dispute whether or not appellant has forfeited this claim on appeal by failing to request a modification of the jury instructions in the trial court. They further dispute whether instructional error occurred and, if so, whether our review for prejudice should be under the standard set forth in *Watson* or *Chapman*. We need not, however, resolve these disputes. When we presume no forfeiture occurred and instructional error is present, prejudice did not result under either standard.

Appellant questions the strength of the evidence in this record and argues prejudice exists when (1) planning activity; (2) motive; and (3) the manner of killing are

12.

analyzed. These are three factors used by our Supreme Court to assess the sufficiency of evidence regarding premeditation and deliberation with first degree murder. (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) Typically, when evidence of all three factors are present, an appellate court will sustain verdicts of first degree murder. Otherwise, there must be strong evidence of planning, or evidence of motive in conjunction with either planning or the manner of killing. (*Ibid.*) These three factors do not assist appellant.

Appellant told Jaramillo approximately two or three days before the murder that he thought Galvan was cheating on him or talking to other people. On the day of the murder, appellant was observed staying close to Galvan or following her around. Jaramillo saw a gun case in the bathroom when she took her shower around 10:00 p.m. After her shower, Jaramillo saw appellant in the living room sitting in a chair in possession of a gun, with Galvan and their sons nearby. Appellant stared at Galvan when she told him to put the gun away. After Galvan went into the master bedroom, appellant asked Jaramillo to take the boys away and then asked her to bring Galvan out of the bedroom. When Jaramillo declined both requests, appellant said something like he did not want to get her involved and he asked her to tell Galvan to come to the restroom. When she refused, appellant walked into the master bedroom with a loaded gun, where he repeatedly shot Galvan at close range. Appellant's mother informed the 911 dispatcher that her son shot her daughter, who was on the floor. When officers searched the residence, Galvan's body was discovered in the master bedroom near appellant's hysterical mother who was lying in bed saying she could not believe he shot her.

This record demonstrates that appellant had a motive to kill Galvan and he planned the shooting. The manner of the killing shows deliberation and premeditation. Further, the jury heard that appellant spoke with a detective in the back of a patrol vehicle for approximately seven minutes. Appellant appeared to understand everything that was asked and he did not provide nonsensical answers. The jury also viewed appellant's

13.

subsequent police interview with the detectives. The jury was able to observe firsthand appellant's demeanor and interactions with the detectives.

Appellant contends the fact he entered the master bedroom with a gun does not mean he had decided to kill Galvan. He further speculates that Galvan may have done something in the master bedroom to trigger an emotional response because he told the detectives that he "started flipping out." There is, however, no evidence that Galvan did anything to trigger an emotional outburst. To the contrary, in his interview with the detectives, appellant denied that Galvan made him "flip" and he said it was something else. In any event, appellant entered the master bedroom with a loaded gun in his hand. Consequently, it is permissible to infer that he intended to kill and considered the possibility of murder in advance. (*People v. Young* (2005) 34 Cal.4th 1149, 1183.)

Based on this record, it was not prejudicial to the first degree murder conviction that the jury was not instructed to consider whether appellant's behavior and statements after the killing were the result of voluntary intoxication and/or mental disorder. The purported instructional error was unimportant in relation to everything else the jury considered on the issue. (*Yates v. Evatt, supra,* 500 U.S. at pp. 403-404.) This record demonstrates beyond a reasonable doubt that there is no reasonable possibility the purported error might have contributed to this conviction (*Chapman, supra,* 386 U.S. at p. 24) or that there is a reasonable probability the outcome of the trial would have been different had the trial court properly instructed the jury. (*People v. Flood, supra,* 18 Cal.4th at p. 490.) Accordingly, appellant's conviction for first degree murder will not be reversed.[3]

## II. Any Instructional Error With CALCRIM No. 225 Was Harmless.

Appellant asserts that the trial court erred when it instructed the jury under

---

[3] Because appellant's conviction for first degree murder will not be reversed, we will not address appellant's secondary argument that a conviction for second degree murder should also be reversed.

14.

CALCRIM No. 225 and not CALCRIM No. 224. He contends the jury was not informed that the "circumstantial evidence rule" applies to premeditation and deliberation. He concludes that his conviction for first degree murder must be reversed.

### A.    Background.

In addition to CALCRIM Nos. 625 and 3428, which are set forth above, the court provided the following relevant jury instructions:

#### 1.    CALCRIM No. 220:

Appellant was presumed to be innocent and this presumption required the People to prove him guilty beyond a reasonable doubt. The definition of "reasonable doubt" was explained.

#### 2.    CALCRIM No. 223:

The jury was informed that both direct and circumstantial evidence were acceptable "to prove or disprove the elements of a charge, including intent and mental state and acts necessary to a conviction."

#### 3.    CALCRIM No. 225:

"The People must prove not only that the defendant did the act charged, but also, that he acted with a particular intent.[4] The instruction for each crime explains the intent required. Intent may be proven by circumstantial evidence. Before you may rely on circumstantial evidence to conclude a fact necessary to find the defendant guilty has been proven, you must be convinced that the People have proven each fact essential to that conclusion beyond a reasonable doubt. Also, before you may rely on circumstantial evidence to conclude that the defendant had the required intent, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent. If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions supports a finding that the defendant did have the required intent, and

---

**4**    In contrast, in each instance where the trial court said "intent" in giving this instruction, the words "(intent/[and/or] mental state)" appear in the form version of CALCRIM No. 225.

15.

another reasonable conclusion supports a finding the defendant did not, you must conclude that the required intent was not proven by circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

### 4. CALCRIM No. 252:

The jury was informed that murder required a specific intent or mental state. In order to find appellant guilty of murder, he "must not only intentionally commit the prohibited act, but must do so with a specific act. The act and the specific intent required are explained in the instructions for that crime."

### 5. CALCRIM No. 520:

The jury was informed that appellant was charged in count 1 with murder, which required the People to prove that he committed an act that caused the death of another person and when he acted "he had a state of mind called malice aforethought." The definition of malice aforethought was provided consistent with CALCRIM No. 520.

### 6. CALCRIM No. 521:

"[T]he defendant is guilty of first degree murder if the People [have] proven that he acted willfully, deliberately and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice, and knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the act that caused death. The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time considered for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rationally [*sic*], impulsively or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated design to kill can be reached quickly. The test is the extent of the reflection, not the length of time. The requirements for second degree murder based on express or implied malice are explained in instruction 520. The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder, and the murder is second degree murder."

### B. Standard of review.

16.

The error in failing to properly instruct a jury on the circumstantial evidence rule is reviewed for prejudice under the standard set forth in *Watson, supra,* 46 Cal.2d at p. 836. (*People v. Rogers* (2006) 39 Cal.4th 826, 886.) Under that standard, reversal is not required if there is no reasonable probability the outcome of the trial would have been different had the trial court properly instructed the jury. (*Ibid.*)

**C.    Analysis.**

A trial court is required to give a circumstantial evidence instruction when a prosecution's case rests substantially on such evidence. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1167.) The instruction must embody the principle that the facts and circumstances of the case must not only be consistent with the theory of guilt but must be inconsistent with any other rational conclusion. (*Ibid.*)

Both CALCRIM Nos. 224 and 225 explain how to consider circumstantial evidence, but CALCRIM No. 224 is more inclusive. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1172.) A trial court is required to provide CALCRIM No. 224 sua sponte when the prosecution relies substantially on circumstantial evidence to prove any element of the case. (*People v. Samaniego*, at p. 1171.) In contrast, "CALCRIM No. 225 is to be used in place of CALCRIM No. 224 'when the defendant's specific intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence.' [Citations.]" (*Id.* at pp. 1171-1172.)

Here, appellant argues that the court erred because CALCRIM No. 225 failed to include "mental state" in the circumstantial evidence rule, and he maintains the jury was presented with a reasonable and alternative theory that he did not kill with the required mental state, i.e., premeditation and deliberation. He points to (1) his intoxication; (2) his statement to the detectives that he "flipped out" in the master bedroom; and (3) Yufik's testimony about the effects of intoxication on a person with a mental disorder, which included the tendency for impulsive rather than thoughtful and deliberative behavior. He contends his seemingly deliberate behavior in loading his gun, asking Jaramillo to take

17.

the boys away and hiding the gun after the killing could have been "automatic, impulsive, non-deliberative behavior." He further maintains the level of methamphetamine in his system would have prevented him from planning, organizing and exercising judgment. He asserts it was imperative that the jury understand it was required by law to accept his interpretation of the circumstantial evidence.

Respondent contends that appellant forfeited this claim on appeal by failing to object below. Respondent further argues that any error in the omission of the "mental state" language was harmless. We need not resolve the dispute between the parties regarding whether or not appellant has forfeited this claim on appeal. When we review the merits of this claim, we agree with respondent that any error was harmless.

CALCRIM Nos. 220, 223, 625 and 3428 informed the jury that: (1) appellant was presumed innocent and the People were required to prove him guilty beyond a reasonable doubt; (2) circumstantial evidence was acceptable to prove intent, mental state, and acts necessary to convict; and (3) the jury was to consider both appellant's potential mental disease and his voluntary intoxication in determining if he acted with an intent to kill, or with premeditation and deliberation.

When reviewing these instructions as a whole, it does not appear reasonably likely that the jury was misled. In making this analysis, we presume jurors are intelligent people capable of understanding and applying all jury instructions given. Based on the verdict in count 1, it is clear the jury rejected the voluntary intoxication defense, or an argument that a mental disorder prevented appellant from forming an intent to kill, or an inability to premeditate and deliberate.

Further, as discussed above in section I, appellant had a motive to kill Galvan and he planned the shooting. The manner of the killing shows deliberation and premeditation. Appellant appeared to understand his conversation with the detective in the patrol vehicle, and the jury was able to observe firsthand appellant's demeanor and interactions with the detectives during his formal interview. Despite his arguments to the

18.

contrary, appellant did not present "a strong circumstantial case" that establishes prejudicial error stemming from the court's failure to include "mental state" in CALCRIM No. 225.

Based on this record, it is not reasonably probable that appellant would have received a more favorable result had the term "mental state" been included in CALCRIM No. 225. Accordingly, appellant's conviction for first degree murder will not be reversed.

## III. The Trial Court Did Not Abuse Its Discretion Regarding The Jury's Note.

Appellant argues that the trial court prejudicially failed in its duty to clear up alleged "instructional confusion" expressed by the jury in a note. He contends forfeiture did not occur despite his counsel's failure to object to the court's response. In the alternative, he alleges his counsel provided ineffective assistance if this claim is deemed forfeited on appeal. He seeks reversal of his conviction for murder.

### A. Background.

When instructing pursuant to CALCRIM No. 521, the trial court made the following relevant statement: "The defendant acted deliberately if he carefully weighed the considerations for and against his choice, and knowing the consequences, decided to kill."

During deliberations, the jury sent the following written note to the judge: "Does consequence mean long term or immediate response to action. ¶ Focus on PG 521[,] part 1[.]" The judge met with the attorneys and discussed the note. The judge stated it appeared the jury was referring to CALCRIM No. 521. The judge said a written response would be sent to the jury stating: "'Words and phrases not specifically defined in these instructions are to be applied using their ordinary everyday meaning. Please refer to instruction 200." Both counsel agreed to that response.

19.

CALCRIM No. 200 had informed the jury, in relevant part, to apply words and phrases using their ordinary and everyday meanings if they were not otherwise specifically defined in the instructions.

### B.      Standard of review.

An abuse of discretion standard is used to review a trial court's decision to instruct, or not to instruct, a deliberating jury.  (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.)  Under this standard, the trial court's decision "must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.  [Citations.]" (*People v. Jordan* (1986) 42 Cal.3d 308, 316, italics original.)

### C.      Analysis.

A deliberating jury may seek further clarification on any point of law arising in the case.  (§ 1138.)  A trial court has a duty to provide the jury with the requested information, and it maintains discretion to determine what additional explanations are sufficient when the original instructions are full and complete.  (*People v. Smithey* (1999) 20 Cal.4th 936, 985.)  A trial court is not required to always elaborate on the standard instructions, and doing so is often risky.  (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) However, a trial court cannot "figuratively throw up its hands and tell the jury it cannot help.  It must at least *consider* how it can best aid the jury.  It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*Ibid*.)

As an initial matter, the parties dispute whether appellant has forfeited this issue on appeal by agreeing with the judge's response.  We need not resolve that dispute because, even when we presume no forfeiture occurred, appellant's claim fails on the merits.

Appellant contends the jury's note "essentially" posed a question of law regarding whether an immediate consequence was sufficient to satisfy the element of deliberation

rather than the long-term consequences. He asserts that the jury's use of the singular (consequence) rather than the instruction's plural (consequences) was a "misreading of the term" showing confusion. He notes that deliberation requires more thought than a mere impulsive intent to kill and maintains the jury should have been alerted that appellant's consideration of any long-term consequences was also required. He concludes that the trial court's answer failed to address the jury's question and failed to alleviate its confusion. We disagree that the trial court abused its discretion.

The court met with both attorneys to fashion a response, and the court considered how to best aid the jury. The trial court did not figuratively throw up its hands and tell the jury it could not help. Further, the instructions provided to the jury regarding deliberation were full and complete, a point which appellant does not challenge on appeal. We presume the jurors are intelligent people capable of understanding and applying all jury instructions given. (*People v. Gonzales, supra,* 51 Cal.4th at p. 940; *People v. Lewis, supra,* 26 Cal.4th at p. 390.)

The single note from the jury does not demonstrate that the jurors were misled or confused, and the jury was able to seek further clarification if it so desired. The jury, however, did not present any further inquiries to the court on this issue. This record does not demonstrate that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. Accordingly, it cannot be said that the trial court abused its discretion.

## IV.    Appellant's Claim of Prosecutorial Misconduct Is Without Merit.

Appellant asserts that the prosecutor committed misconduct regarding Yufik. He seeks reversal of his murder conviction.

### A.    Background.

After Yufik finished his direct testimony for the defense, the prosecutor questioned him about his hourly fee. Yufik said he charged $200 per hour, which did not include travel time. The prosecutor later concluded his cross-examination of Yufik with the following exchange:

"Q    Just so we're clear, I asked you about your fee. The court's not paying you, correct?

"A    I believe it's county.

"Q    Mr. [defense counsel's] office?

"A    Yes."

During closing arguments, the prosecutor reminded the jury that Yufik was making $200 an hour, which did not include driving time. The prosecutor noted he asked Yufik who was paying his bill, and the prosecutor said the following:

"'Fresno County.' Really? That's your answer? You're paid by the defense. Don't hide behind it. Don't try to pull something over on the jury. Fresno County? Come on. You're paid by the defense, and he did own up to that when I said, 'Mr. [defense counsel] hired you,' because the funds don't come from Fresno County. Fresno County just doesn't reach out to psychologists and pay them money for no reason. It's because the defense hired him. Why would he try to do that other than this right here. 'Your expert will stand firm on his psychological opinions.' This is not in the criminal portion of his website. This is under the forensic psychology portion of the website. And what did Dr. Yufik do here? He stood firm. 'Doctor, let me talk to you about certain facts, certain pieces, certain opinions that maybe you don't know about.' What did he do when he talked about falling asleep? 'Oh, the detective is wrong. I'm standing firm.' He's paid some money. 'It's my opinion, and I'm not going to change my opinion. I'll stand firm. That's what you can expect when you hire me.' It's his advertisement."

**B.    Standard of review.**

The Fourteenth Amendment to the United States Constitution is violated when a prosecutor's conduct denies the right to a fair trial. (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.) If the prosecutor's conduct does not create a fundamentally unfair trial,

California law is nevertheless violated if the prosecutor used reprehensible or deceptive methods to attempt to persuade the jury or the court. (*Ibid.*) Prosecutorial misconduct occurs when a prosecutor misstates evidence during closing arguments (*People v. Davis* (2005) 36 Cal.4th 510, 550) or makes statements regarding facts which are not in evidence. (*People v. Linton, supra,* at p. 1207.)

## C.    Analysis.

The parties dispute whether prosecutorial misconduct occurred. Appellant contends the prosecutor unfairly misled the jury about the source of Yufik's payment by commenting on facts that were not in evidence, and by referring to Yufik as a liar. Respondent asserts that the prosecutor made fair comments regarding the evidence. We need not resolve the issue of whether the prosecutor's comments amounted to misconduct or not. Instead, appellant forfeited this issue on appeal by not preserving it with an objection in the lower court, and this record does not establish ineffective assistance of counsel. Further, even when we presume no forfeiture occurred and the prosecutor committed misconduct, prejudice is not present.

### 1.    Appellant forfeited his claim on appeal.

Generally, a defendant must object in the trial court and request an admonition in order to preserve a claim of prosecutorial misconduct. (*People v. Linton, supra,* 56 Cal.4th at p. 1205.) This requirement is excused, however, where an admonition would not have cured the prejudice or it would have been futile. (*Ibid.*)

Appellant concedes that his defense counsel failed to object or seek an admonition in the lower court regarding the prosecutor's comments, but argues his counsel was excused from that general requirement because the alleged misconduct was "so prejudicial" an admonition would not have cured the harm. He relies principally upon *People v. McGreen* (1980) 107 Cal.App.3d 504 (*McGreen*), disapproved on other grounds in *People v. Wolcott* (1983) 34 Cal.3d 92, 101. This reliance is misplaced.

23.

In *McGreen, supra,* 107 Cal.App.3d 504, two codefendants were charged with robbery, attempted robbery and burglary. McGreen was convicted of all three counts as charged while his codefendant was acquitted of robbery but found guilty on the remaining two counts. (*Id.* at p. 508.) McGreen's sole defense was diminished capacity, based on substantial evidence he had been drinking beer and vodka during the evening before the robbery, along with Valium tablets taken before and during his drinking bout. (*Id.* at p. 514.) McGreen relied upon an expert witness to opine regarding the synergistic effects of alcohol and Valium in his system. The expert testified that McGreen would have lacked awareness regarding his actions with "'a significantly reduced level of consciousness.'" (*Ibid.*) During cross-examination, the prosecutor sought to discredit the defense expert by attempting to show the expert had received B and C grades in certain courses in graduate school, his membership in certain scientific societies was a sham, and that the expert had resigned from one past scientific organization because of allegations of unethical conduct relating to the expert's purported perjury at a previous trial. Following a defense objection, the trial court struck any questions regarding the expert's alleged perjury. (*Id.* at pp. 514-516 & fn. 10.) The prosecutor, however, continued his questioning, pressing why the expert had left this particular organization, and asking if the expert's testimony had been stricken in the case involving the alleged perjury. (*Id.* at pp. 516-517.)

Following another defense objection, and outside the presence of the jury, the prosecutor informed the trial court that the expert was disqualified from testifying in either Santa Cruz or San Mateo Counties because he was "'patently unbelievable.'" When pressed by the court, the prosecutor said he had no authority for the admission of such evidence but he would look for it, but none was ever offered. (*McGreen, supra,* 107 Cal.App.3d at pp. 516-517 & fn. 13.) In his argument to the jury, the prosecutor noted that the expert had resigned from the particular organization because of an ethics

24.

investigation, and the prosecutor called the expert "'a habitual and chronic liar.'" (*Id.* at p. 517 & fn. 14.)

The appellate court found that the prosecutor's reference to the alleged perjury was clear misconduct, and the prosecutor made that reference more than once even after the trial court struck the matter. (*McGreen, supra,* 107 Cal.App.3d at pp. 517-518.) *McGreen* determined that the misconduct was prejudicial because it was not a one-time event. Further, the expert was the crucial witness for the defense, which tried to establish diminished capacity. The key to that defense rested in large part on the expert's credibility. (*Id.* at p. 518.) Finally, the appellate court held that the jury had been improperly instructed on the so-called definition of "'moral certainty'" which the Supreme Court had held was error to use. (*Id.* at p. 519, fn. omitted.) The appellate court determined that the defendant was "severely prejudiced" based on the cross-examination of the expert and the inflammatory rhetoric of the prosecutor's closing argument. (*Id.* at p. 519.) The defendant's failure to object to the prosecutor's remarks did not result in forfeiture because an admonition would not have cured it. Without the prosecutor's misconduct, coupled with the instructional error, the *McGreen* court held it was reasonably probable a more favorable result to the defendant would have resulted. (*Id.* at pp. 519-520.)

Here, unlike in *McGreen*, the prosecutor did not engage in lengthy cross-examination of Yufik regarding his hourly rate, and certainly not after a motion to strike was granted on that subject. Although the prosecutor said Yufik was trying "to pull something over" on the jurors, the prosecutor did not expressly call Yufik a liar, much less a habitual and chronic one. Although the prosecutor said the funds for Yufik's testimony did not come from Fresno County, which were facts not in evidence, that was a single comment that was part of his overall message that Yufik was a paid defense expert who would not change his opinion even when presented with contrary facts. *McGreen* is

25.

distinguishable and does not establish that an admonition could not have cured any misconduct.

In contrast, *People v. Sandoval* (1992) 4 Cal.4th 155 (*Sandoval*), is instructive. In *Sandoval*, the defendant was convicted of four counts of first degree murder. (*Id.* at p. 167.) A forensic psychiatrist testified as an expert witness for the defense in support of a self-defense claim as to one of the victims, who had high levels of phencyclidine (PCP) and alcohol in his blood. The expert opined that at the time of his death, this victim was in an angry, aggressive and violent mood. (*Id.* at p. 179.) On cross-examination, the expert testified that the mental state reached under the influence of alcohol was different from the mental state reached under the influence of PCP. The prosecutor reminded the expert that he had testified differently in previous cases, and asked the expert if his answer was dependent on his role in this case. The prosecutor questioned the expert regarding what he knew about the facts of the case, whether the defense had told him what he had to accomplish to overcome the prosecution's case, whether the expert tried to affect the outcome of a case through his testimony, and whether the expert instructed attorneys on what questions to ask him during trial. During closing arguments, the prosecutor referred to the expert's admission that he had testified differently in other cases regarding the distinction between alcohol and PCP intoxication. The prosecutor stated that the expert "'is a liar.'" (*Ibid.*) On appeal, the Supreme Court noted that the defendant objected to the questions posed to the expert on cross-examination, but no objection was lodged during closing argument regarding the prosecutor's use of the term "'liar.'" As a result, *Sandoval* held that the defendant had not preserved any claim of prosecutorial misconduct because "any harm caused by this characterization could have been cured by a timely objection and an admonition. [Citation.]" (*Id.* at p. 180.)

Here, similar to *Sandoval*, a timely objection and request for admonition could have cured any prejudice that arose during closing arguments from the prosecutor's brief

comments regarding the source of Yufik's compensation. Accordingly, appellant has forfeited any claim on appeal that the prosecutor committed misconduct.

### 2. Appellant cannot establish ineffective assistance of counsel.

To establish a claim of ineffective assistance of counsel, a defendant must first show that his or her counsel's performance was deficient, which is representation that was below an objective standard of reasonableness. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051.) A strong presumption exists that counsel's conduct fell within the wide range of reasonable professional representation. (*Ibid.*) "'In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' [Citation.] For this reason, claims of ineffective assistance of counsel 'are ordinarily best raised and reviewed on habeas corpus.' [Citation.]" (*Ibid.*)

The parties dispute whether or not defense counsel had a tactical reason for not objecting. Appellant contends there was no reasonable tactical basis for his counsel to withhold an objection or seek an admonition. Appellant relies on lower federal court authority and argues it is not an objectively reasonable tactical choice to have a general fear "an objection would do more harm than good because it would focus the jurors' attention on the prosecutor's statement even if the court instructed them otherwise." (*Washington v. Hofbauer* (6th Cir. 2000) 228 F.3d 689, 705-706, fn. omitted.)

Respondent notes that appellant's reliance on the lower federal court authority is not binding on this court. Respondent also argues that defense counsel could have had a possible tactical reason not to object in order to avoid drawing attention to the issue. We agree with respondent.

*Washington v. Hofbauer, supra,* 228 F.3d 689, is not controlling on us and we decline to follow it. (*People v. Williams* (1997) 16 Cal.4th 153, 190 [lower federal court decisions interpreting federal law are not binding on state courts].) To the contrary, our

Supreme Court has noted that defense counsel can have a tactical reason for not objecting to particular comments by a prosecutor. (*People v. Huggins* (2006) 38 Cal.4th 175, 206.) It is possible defense counsel did not want to draw the jurors' attention to the particular issue. (*Ibid.*)

Appellant's claim fails in the context of this direct appeal because this record does not reveal that defense counsel had no conceivable tactical reason for not objecting to the prosecutor's closing argument. Accordingly, appellant cannot establish a claim of ineffective assistance of counsel.

### 3. No prejudice occurred from the prosecutor's comments.

In order to reverse a defendant's conviction based on prosecutorial misconduct, it must be reasonably probable that the defendant would have obtained a more favorable result without the misconduct. (*People v. Tully* (2012) 54 Cal.4th 952, 1010.) Here, the prosecutor's comments did not amount to an egregious pattern of conduct that rendered the trial fundamentally unfair in denial of appellant's federal constitutional right to due process of law. (See *People v. Smithey, supra*, 20 Cal.4th at p. 961.)

Assuming the prosecutor's comments constituted a deceptive method to persuade the jury, these comments were isolated. Given the state of this record, it is not reasonably probable appellant would have obtained a more favorable result had the prosecutor not made these statements. Accordingly, appellant's murder conviction will not be reversed.

## V. No Cumulative Prejudice Exists.

Appellant asserts that his murder conviction must be reversed based upon the alleged cumulative prejudicial impact stemming from his first four arguments. He contends the series of trial errors, although individually harmless, collectively rose to a level of reversible and prejudicial error. We disagree.

Appellant was entitled to a fair trial but not a perfect one. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [the defendant's cumulative prejudice argument rejected based on findings each individual contention lacked merit or did not result in prejudice].)

Each of the alleged errors discussed above were individually harmless, and collectively they "did not outweigh the sum of their parts."  (*People v. Roberts* (1992) 2 Cal.4th 271, 326.)  Accordingly, cumulative prejudice does not exist sufficient to warrant reversal of the murder conviction.

## VI.    Sufficient Evidence Supports The Child Endangerment Convictions.

Appellant asserts there was insufficient evidence to support his convictions of misdemeanor child endangerment in counts 3 and 4.

### A.    Background.

#### 1.    The information.

The information charged appellant in count 3 as follows:

> "On or about June 18, 2012, in the above named judicial district, the crime of CRUELTY TO A CHILD BY ENDANGERING HEALTH, in violation of PENAL CODE SECTION 273a(b), a misdemeanor, was committed by [appellant], who was a person having the care and custody of John Doe 1, a child of 8 years, who, under circumstances and conditions other than those likely to produce great bodily injury and death, did willfully cause and permit the person and health of said child to be injured, and did willfully cause and permit said child to be placed in such a situation that his person and health may be endangered."

Appellant was charged in count 4 with the identical offense, except that the victim was named as "John Doe 2, a child of 5 years."

#### 2.    The jury instruction.

The jury received the following instruction pursuant to CALCRIM No. 823:

> "The defendant is charged in counts 3 and 4 with child endangerment.  To prove the defendant is guilty of this crime, the People the [*sic*] must prove that, one, the defendant, while having care or custody of a child willfully caused or permitted the child to be placed in a situation where the child's person or health was in danger and the defendant was criminally negligent when he caused or permitted the child to be in danger.  Someone commits an act willfully when he or she does it willingly or on purpose.  A child is any person under the age of 18.

29.

"Criminal negligence involves more than ordinary carelessness, inattention or a mistake in judgment. A person acts with criminal negligence when[,] one[,] he or she does an act in a reckless way that is a gross departure from the way an ordinary careful person would act in the same situation. Two, the person's acts amounted to a disregard for human life or indifference to the consequences of his or her acts, and three, a reasonable person would have known that acting in that way would naturally and probably result in harm to others."

### 3. Closing arguments.

During closing arguments regarding counts 3 and 4, the prosecutor said this was not an abuse case, but involved appellant "putting his children in danger, causing them to suffer, essentially, emotional damage." The prosecutor noted that a child was "in this house with his dad murdering his mom. That, in and of itself, should be worth something, but if we break it down even further, we now have police officers outside of this house. Their guns are drawn, pointed at this house, pointed at these children, and when he has them at that front door. Forget about the fact that they're going through all kinds of things, because their mom has just been murdered, and they know it, five and nine years old. He's got them at the front door in front of him." The prosecutor argued that appellant acted only for his own self-interest with the kids in front of him while the police officers were pointing their guns towards him. The prosecutor contended that appellant acted criminally negligent because he put his sons in that situation, concluding that appellant "caused them to suffer."

### B. Standard of review.

For an appeal challenging the sufficiency of evidence, we review the entire record in the light most favorable to the judgment to determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt based on credible evidence that is of solid value. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) We are to presume the existence of any fact the jury could have reasonably deduced from the evidence in support of the judgment. In doing this review, we neither reevaluate a witness's credibility nor reweigh the evidence. If the jury's findings are reasonably

justified by the circumstances, we will not reverse a judgment simply because the circumstances might also reasonably show a contrary finding. (*Ibid.*)

We are not required to ask whether we believe the trial evidence established guilt beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) Rather, the issue is whether any rational jury could have found the essential elements of the crime beyond a reasonable doubt after viewing the evidence favorably for the prosecution. (*Ibid.*)

### C. Analysis.

Section 273a, subdivision (b), provides, "Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered, is guilty of a misdemeanor."

Appellant asserts, and respondent does not dispute, that the convictions in counts 3 and 4 were based only on the last prong of section 273a, i.e., endangerment. We agree based on the pleadings and the jury instruction for counts 3 and 4. Accordingly, we will focus our inquiry on whether this record contains substantial evidence that appellant willfully caused or permitted his sons to be placed in a situation where their person or health may have been endangered.

Appellant notes the prosecutor's closing argument encompassed theories for conviction that went beyond the pleadings. The prosecutor said appellant's sons suffered "emotional damage" and they were "going through all kinds of things" after their mother was murdered, and appellant "caused them to suffer." Appellant contends the jury did not have a rational basis to conclude he endangered his children in a criminally negligent manner. He asserts there was no evidence the police had a reason to fire their weapons

31.

when he brought his children to the front door; he was unarmed, not defiant, and was simply attempting to exit the house with his children. He argues his actions were reasonable under the circumstances because he could not leave his sons behind in the house. We disagree.

Appellant was using methamphetamine and was under its influence while his sons were present. Appellant's sons were in the residence when he fired his gun multiple times, killing their mother. Appellant paced with his two sons in the house before appearing at the front door behind his sons, who were standing shoulder to shoulder. An officer informed the jury that appellant appeared to be using his sons as a shield.

This evidence shows that appellant willfully caused or permitted his children to be placed in a situation where their person or health may have been endangered. (§ 273a, subd. (b).) The convictions in counts 3 and 4 were based on credible evidence that was of solid value. (*People v. Houston, supra,* 54 Cal.4th at p. 1215.) Appellant attempts to show his actions in taking his sons to the front door could be construed as reasonable under the circumstances and did not rise to criminal negligence. However, we do not reweigh the evidence. When the jury's findings are reasonably justified by the circumstances, as they are here, we will not reverse a judgment simply because the circumstances might also reasonably show a contrary finding. (*Ibid.*)

Based on this record, a reasonable jury could have found appellant guilty of misdemeanor child endangerment beyond a reasonable doubt. Accordingly, counts 3 and 4 will not be reversed for insufficient evidence.

## VII. Prejudice Did Not Occur When The Jury Was Instructed That Child Endangerment Is A General Intent Crime.

Appellant asserts that the trial court erred in instructing the jury with CALCRIM No. 252 that child endangerment requires general criminal intent.

### A.    Background.

The court provided the jurors with the following relevant instructions:

#### 1.    CALCRIM No. 225:

The prosecution must prove not only that appellant did the act charged, but that he also acted with a particular intent. "The instruction for each crime explains the intent required."

#### 2.    CALCRIM No. 252:

The jury was informed that child endangerment as charged in counts 3 and 4 required a general intent. The jurors were further told, "For you to find a person guilty of these crimes and allegations, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act, however, it is not required that he or she intend to break the law. The act required is explained in the instruction for those crimes and allegations."

#### 3.    CALCRIM No. 823:

"The defendant is charged in counts 3 and 4 with child endangerment. To prove the defendant is guilty of this crime, the People the [*sic*] must prove that, one, the defendant, while having care or custody of a child willfully caused or permitted the child to be placed in a situation where the child's person or health was in danger and the defendant was criminally negligent when he caused or permitted the child to be in danger. Someone commits an act willfully when he or she does it willingly or on purpose. A child is any person under the age of 18.

"Criminal negligence involves more than ordinary carelessness, inattention or a mistake in judgment. A person acts with criminal negligence when[,] one[,] he or she does an act in a reckless way that is a gross departure from the way an ordinary careful person would act in the

33.

same situation.  Two, the person's acts amounted to a disregard for human life or indifference to the consequences of his or her acts, and three, a reasonable person would have known that acting in that way would naturally and probably result in harm to others."

## B.    Standard of review.

The harmless error analysis under *Chapman, supra,* 386 U.S. 18, is the appropriate test to review an erroneous jury instruction that omitted an element of an offense. (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663.)  This test asks whether it appears beyond a reasonable doubt that the error did not contribute to the jury's verdict such that a rational jury would have found the defendant guilty without the error.  (*Ibid.*)

## C.    Analysis.

We agree with the parties that the trial court erred when it instructed the jury that child endangerment is a general intent crime.  (See *People v. Valdez* (2002) 27 Cal.4th 778, 789-790 [criminal negligence is the appropriate standard when an act is intrinsically lawful but creates criminal liability because the circumstances establish a risk of serious injury].)  The parties agree that *Chapman, supra,* 386 U.S. 18, is the appropriate standard to review prejudice, but they dispute whether this error was prejudicial.

Appellant argues it is reasonably likely the jurors would have believed the erroneous instruction under CALCRIM No. 252 "prevailed" over the instruction contained in CALCRIM No. 823.  He further contends that the closing arguments did not clarify any jury confusion because the prosecutor did not focus his arguments on the "dangerous situation" prong of section 273a, subdivision (b), but instead referred to the children's suffering and "emotional damage."  Finally, he asserts the jury must have applied the incorrect general criminal intent standard rather than the criminal negligence standard, renewing his argument that there was insufficient evidence that he acted criminally negligent.  We do not agree.

As discussed above, there was sufficient evidence that appellant acted criminally negligent by willfully causing or permitting his children to be placed in a situation where

34.

their person or health may have been endangered. Although CALCRIM No. 252 erroneously stated that child endangerment required a general intent, this instruction also informed the jury that the required act for conviction would be explained in the instruction for these crimes and allegations. CALCRIM No. 823 provided detailed instructions regarding the elements necessary to prove child endangerment. The jury was informed that appellant must be "criminally negligent when he caused or permitted the child to be in danger." The term "criminal negligence" was defined for the jury.

Based on this record, it does not appear reasonably likely that the jury would have ignored the instructions in CALCRIM No. 823 because of the very brief mention of "general intent" in CALCRIM No. 252. It appears beyond a reasonable doubt that the error did not contribute to the jury's verdict such that a rational jury would have found appellant guilty without the error. Accordingly, appellant's convictions in counts 3 and 4 will not be reversed.

## VIII.   The Jail Sentence On Counts 3 And 4 Must Be Reduced.

We agree with the parties that sentencing error occurred on counts 3 and 4.  A misdemeanor offense is punishable by imprisonment in the county jail not exceeding six months, unless a different punishment is prescribed by law.  (§ 19.)  Here, the jury found appellant guilty in counts 3 and 4 of misdemeanor child endangerment.  At the sentencing hearing, the trial court imposed a three-year determinate sentence in state prison for count 2 (unlawful possession of a firearm by a felon) followed by two consecutive indeterminate terms of 25 years to life for count 1 (murder with the firearm enhancement).  The trial court ordered appellant to receive credit for time served for counts 3 and 4.  Total time credits of 583 days were awarded, with zero good-time/work-time credits pursuant to section 2933.2.  Regarding counts 3 and 4, the "corrected minute order" for the sentencing hearing states appellant is "to serve 583 Days Fresno County Jail."

The minute order for the sentencing hearing reflects a sentence of 291 and one-half days per misdemeanor count, far in excess of the maximum sentence of 180 days.  These sentences must be reduced accordingly.  As for the remedy, we could remand for a new hearing, which would require pulling appellant out of his prison program and transporting him to superior court for a new sentencing hearing that will not change his actual prison time.  "The futility and expense of such a course militates against it."  (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1473.)  Instead, we will exercise our authority to modify the punishment imposed on the misdemeanor convictions in counts 3 and 4.  (§ 1260; *People v. Alford, supra,* at p. 1473.)  The sentences on counts 3 and 4 are reduced to 180 days each, and appellant is deemed to have served that time.

In his reply brief, appellant states that his "remaining presentence time" should be credited against his prison sentence after the sentence on his misdemeanor convictions is reduced to the maximum.  We are uncertain of appellant's statement because he cites no

authority, and we have found none, establishing that his presentence custody credits must be reduced after receiving credit for time served for his misdemeanor convictions. Appellant's prison commitment is contained on two abstracts of judgment, and each abstract cross-references the other. The indeterminate abstract of judgment reflects appellant's presentence custody credits of 583 days. Appellant has received full presentence custody credits for his prison commitment.

## DISPOSITION

The trial court is directed to modify its January 22, 2014, "corrected minute order" to reflect that appellant is to serve a total of 360 days in the Fresno County Jail for counts 3 and 4, which is deemed served.  The judgment is otherwise affirmed.

_____
LEVY, Acting P.J.

WE CONCUR:


_____
GOMES, J.


_____
DETJEN, J.